2016-2004. You've lost your audience. The important audience is sitting right here waiting. More important, yes. We'll be ready when you are, Mr. Whittaker. Yes, Your Honor. Thank you, Your Honor. My name is Malcolm Whittaker, and I'm here today on behalf of Plaintiff Appellant TDE Petroleum Data Solutions. With me is Dr. Eric Maedler. Dr. Maedler is the president and part owner of TDE. TDE has built a very successful business based in the patent on suit, namely U.S. Patent 6892812. But what you've got are a couple of claims, a method and a system claim. You're looking at the method claim. You're dealing with the plurality of states. That's data, receiving data, determining that some of the data are valid by comparing data, and then selecting one of the states. This is all data handling. I think you're falling into the same misconception that the district court did, right? The data cases that you're talking about, for example, Digitech that Your Honor wrote, that was... I didn't write Digitech. I was on the panel. You might avoid attributing certain decisions of this court to certain judges because once they're issued, they're decisions of the court, so it doesn't matter who wrote them. Yes, Your Honor. My apologies. In Digitech, that called out a pure data set, a first data set and a second data set, and then you combined the first data set and the second data set into the device profile. So here what we have, which is different, we have a technological solution to a technological problem, right? Digitech is just I've got a piece of information, I've got another piece of information, color and location, I put them together. You say solution to a problem. We have to look at the claims. Yes. And the claims deal with data handling. Well, they deal with data handling in the sense that we have data coming from tangible physical machinery, the machinery that makes up the world. But you're not claiming the machinery. No, could you? Well, if we look at, for example, Claim 1, Element 2, it recites receiving mechanical and hydraulic data reported for the well operation from a plurality of systems. And we know from Column 4 that the plurality, we know that the plurality of systems is oil well, the components that make up the oil rig, Kellys, a top drive, a mud pump, a mud tank. But those claims aren't directed to any of those specific things. You didn't invent any of those components of the drilling system, did you? The inventors did not invent the mud tank. But I think you're falling into the same trap the district court did. Maybe I'm just agreeing with the framework that the district court imposed here. But what we've got here and what the cases, the abstractness, the Alice cases all require, is they don't have input from a tangible physical machine. For example, in Digitech, the Digitech court held the Digitech patents were ineligible because the claim, and I'm reading from the opinion, thus recites an ineligible abstract process of gathering and combining data. What difference does it make that the data comes from a physical machine as opposed to data that involves color or financial information or the like? It's still data. Okay. In Alice, we talked, the Supreme Court talked about we don't want to allow somebody… Let me back up because this is a question that I really want to make sure I understand. You have a lot of claims in this patent, and lots of little dependent things here and there. It did not seem to me from reading your briefs that you argued separately that some of them, even if we agreed with the district court, that the others were still eligible for other reasons. Are you basically, do they all stand or fall together? I would say that particularly the claims that recite tangible physical structure, tangible physical machinery, are distinct from the other claims. But even claim one… But did you argue them separately? I didn't see that really in your briefs other than maybe a small reference in your reply brief that said some of these dependent claims add additional machinery, but it didn't explain how that additional machinery transformed the abstract idea. Well, there's nothing in the record below that suggests that using that machinery… For example, if we look at claim one, right, we have, for example, receiving mechanical and hydraulic data reported for the well operation from a plurality of systems. All of the Alice, which was intermediated settlement, the Supreme Court said we don't want the person with the cleverest patent lawyer to be able to grab old business methods, doing things faster, and organizing human behavior on a computer. Mr. Whitaker, if we don't agree with you, and if we conclude that the claims claim abstract idea, that doesn't necessarily preclude you from patent eligibility, does it? No. There is step two. What is there that is something more that is in the claims that should meet the Supreme Court's test? Well, I'm glad you asked that question, Your Honor. So the way Alice teaches us to look if we move to the inventive step, and with respect, I don't agree that the claims recite abstract ideas because of the presence of the tangible… I understand that. Thank you, Your Honor. So Alice step two tells us that if a claim is abstract, it can still be patent eligible if it has an inventive concept that is substantially more than the abstract idea. Is this really, despite whether the Supreme Court was right or wrong in melding 102 and 103 into 101, is that really what's at issue? Something more means something different, maybe even non-obvious? Is that what something more is? And do you meet it here? And how? The case law seems to suggest that it's are the steps conventional or well-known, and I agree with Your Honor that sometimes that seems to—the analysis seems to be a 102-103 analysis even when it's not said—when it's not acknowledged that way. But if I've answered that question, if I might step through the different elements of claim one and talk to you about why they're not conventional or well-known and why the record below doesn't support that. So with respect to the storing well states, the very first element of claim one, a good illustration of this is Mobilizer's fictitious drilling engineer, Tom, who only had a 25% chance, and we talk about that in A370 and in our principal brief at pages 9 to 10. And if we look at Mobilizer's reference, Hutchinson found at A817, figure 6A, chose a patent that purports to determine five but not all 16 well states. So we—our claims expressly call out all 16 well states, but yet there's not any references that teach or claim those 16 references. So storing the 16, I don't think there's any evidence in the record that those are— Now, validating data by comparing to a limit. Well, this—the claim doesn't recite all or the issue isn't all versus some. It's still data. Were those 16 well states known previously to a petroleum engineer? A petroleum engineer would likely have known those states. The difficulty is, is that what we have is a combination, right? This was a breakthrough patent. In fact, Dr. Madel bought the patent for half a million dollars from his employer and set up his own business to do this because nobody could do this before. Of course, the question isn't whether it's a good idea, even a great idea. I mean, there are lots of great ideas, and based on the Alice test, they don't meet the test for patent-eligible subject matter. So it's not a question of whether it's a great idea or not. I acknowledge that. It's whether—step two is whether there's something more, and where have we found something more, DDR? In DDR, that was the self-referential table. You did find something more in self-referential table. The self-referential table was in fish, and it wasn't done under something more. It was done under step one of Alice. Under abstracts, yes, you're correct. The distinction with all of those cases was that they weren't a technological solution to a technological problem. If I might talk to you for a moment about the validating data step, right? In Mobilizer's own invalidity references, it teaches that there are at least 20 different ways of validating data. How do you define a technological problem as opposed to any other kind of problem, that it involves technology? No, I would say a technological problem is Diamond v. Deere making rubber, right? That was a relatively simple case. You've got a temperature sensor. You've got a press. You've got rubber. Do we know is it cured or is it uncured? The input there is the temperature. Well, that changed one substance into another, right? Yes. It doesn't seem to happen in time one. Well, if you think about what Deere said, what it did was it told you the state of the rubber is uncured, and then it told you now the state of the rubber is cured. It wasn't really telling you the rubber is cured or uncured. It's telling you the state of the rubber is cured versus uncured, right? And it's doing that off one data input, but it's data input from a piece of machinery. In all the cases, Alice, Bilski, they don't bring in data from technological machinery, right? If a hedge or an intermediated settlement fell on your foot, you'd be perfectly fine. If a top driver or a Kelly fell on you, it'd crush you. But isn't the issue in Deere, and why the Supreme Court found it patentable, is that it was using that abstract idea to change a process and improve the process and, in the case of the rubber, tell you when the curing was done. What did your abstract idea, assuming we think it's abstract under step one, do at all except tell you what state it is? Do the claims then further cover if it's in this state, the drill should do this or the drill should do this or the drill should do this, or is it just telling you at the end of the day the drill state is X? Well, in Claim 30, Claim 60, and Claim 90, we talk about controlling it, controlling the well operation based on what the determination of the well state is. And in the spec they talk about that, but it's not other than in Claims 30, 60, and 90. But what does it say about controlling it? Does it just tell you you can control it based upon the state, or does it actually, like Deere, use that mathematical formula to continue curing or not continue curing? Well, for example, and I see I'm into my rebuttal time here, for example, if you take a kick of gas, like they did in Macondo, if you're in the tripping state as opposed to in slips or drilling, you're a person of ordinary skill in the art will know that you take different countermeasures to contain the kick of gas when you're in each of those different states. And a person of ordinary skill in the art knows that. But you've not patented that person of ordinary skill. He's not part of your operation. That's the difference between what you're saying here and what Deere did. Well, what Deere did is it told you, is the rubber in the cured state or is the rubber in the uncured state? Here we're taking this raw information from machines. It's not just an abstract idea. It's taking raw data from a plurality of well systems. It's validating it in a very specialized way. We talk in the briefs about how there's a large number, more than 30 different ways of validating data. How is it common knowledge? I think it's for you to say that you're transforming sensor data representative of a physical object into another state, which is what you do say in your blue brief. Yes. And which is what your opponent in the red brief says you didn't raise before the district court. If I may point to 744 and 745. Okay. At the bottom of A744 we talk about the machine or transformation test where we say we cite Fairfield Industries. This stems from the Federal Circuit's machine or transformation test, which provides a useful and important clue. The test considers whether the invention is tied to a particular machine or apparatus, which we very clearly have here. It's a well machinery that harvests, that collects mechanical or hydraulic data and transforms the particular article into a different state or thing. So we argued machine or transformation test in the district court, A744 to A745. And here what we've done is we've taken this raw data that's representative, we filter it, and then we determine what the well state is. And if you look at figures 5A and 5B of our patent, the 812 patent, we have a mathematical formula for doing that. That's what they did in Deere. They took data, they used a mathematical formula. That's what they do in ours. We take data, we use a mathematical formula. Well, you've consumed your time, but let's hear from the other side, and we'll give you three minutes of rebuttal time. Thank you, Your Honor. Mr. Mims. Good morning. May it please the court, I'm Peter Mims. I'm here on behalf of AKM Mobilize. And you've covered a lot of the issues that I wanted to discuss, but let me try to focus in on where you were analyzing it. But if we deal with you, if we agree with you that the claims deal with abstract ideas, what about the second issue, something more? There is not something more in these patents. What is something more? To me, something more is an unconventional, if you're going to use prior concepts and systems like computers or sensors, you have to have something that is a nonconventional combination. In other words, can it be more ideas, more data handling if it's unconventional? Well, in these claims, what I view as a something more test, you would look at the sensors and their computer to see if they did something in the computer arts, which we don't believe they did because it will work on a general purpose processor. And we don't think they had anything on the sensors that he argues because they're conventional sensors. But they don't claim sensors. They claim data, which goes back to step one. In other words, does more data handling constitute more if it's very clever? Well, I don't think doing more data handling at higher speed and more accurate doesn't count. We know that from some of the cases. I think you would have to do something that reflected on the hardware of the computer in some sense or this database claim that you talked about earlier. I think it's much harder to show with a computer program given the court's precedent and the U.S. Supreme Court's precedent to get over that hurdle. And we talked about Diamond v. Deere. Supposing the program did what the person skilled in the art would do to react to those 16 data points and controlled the field and its operation based on that data. Would that be the something more? I don't believe so. Well, I'd have to read the claims, of course, to know because the claims are the start. And the claims I think you're referring to, the only claims that they have. No, they don't do that. They don't do that at all. But supposing a patent did do that. Then you start getting close to Diamond v. Deere. Diamond v. Deere is so different. That's why I asked the question. You have thermocouples on the inside of the press. You actually have a method claim changing rubber. And you go out to the field and open a valve or run a solenoid out there and open the press. And to me, if at the end of their claim they said, and then we went out and we shut the blowout preventer or something like that, that would be like Diamond v. Deere. They don't claim that. And they don't disclose that. Their point here is to… I'm just speculating on the lines of Judge Lurie's question of what would be more. Right. I think reading the cases that have come out, most of them have dealt primarily with software nuances. And to me, those really aren't applicable here because there's really nothing unusual in their flow charts or programming. They have… I mean, I think the question earlier was, are these well states in the prior one of you asked? And counsel said they would probably be known. And that's true. I mean, drilling engineers have gone out to drilling rigs and looked at the instruments and reported back on the phone back in the 70s and 80s, the rig is running today and it's running at this flow rate, or it's not running, or we're drilling today and we're doing this. And they're doing that based on instruments. And they are characterizing or categorizing those sensors into you could call a well state. And people have systematized the idea of well states for some time. The drilling engineers in the 1920s and 30s were saying, I hear something funny down here. Well, once… It's a sensor. Right. Once you had measurement. Once you have measurement, then you can start to describe what's in the field. People have been able to measure temperature and pressure for a pretty long time. But these claims are all about data. I mean, my view is it's storing data, it's comparing data, and then it's going to a lookup table and picking, based on logic, what state you're in. And there's a… From our briefs, we cover a lot of the case law. And the abstract idea, concept to me is fairly well explained. I don't think counsel ever explained an answer to Planet Bingo below or on appeal, which to me is a very analogous case because they're very high-level claims that one can do with a pencil and paper. And in our hypothetical, if you look at a plurality of states, if my states are drilling and not drilling, I can look at the flow rate of the mud and the turning of the drill, and I can say it's drilling or not drilling. Whether it's accurate or not does not matter. The claims do not claim accuracy. They don't claim real time. They don't claim depth of the well. Many of the arguments in their briefs are unclaimed features from the embodiments. And I just don't think that's proper analysis in a 101 case. There's much about… Are you saying the subject matter in the patent that could have been claimed that would have met a 101 test? I don't think there's a disclosure to meet it because I don't see anything that ever goes out and impacts or changes the drilling operations. It monitors all this data and tells you how people drill. Those flow charts about how people pick states, I would think most petroleum engineers could gin up those flow charts fairly easily based on their know-how of being in the oil and gas industry. So it's not like they came up with a new algorithm other than it's their particular categorization of that data, which they apply to interpret the measurements. While we're on this measurement issue, I think one important case that you could consider that's discussed in Mayo is Parker v. Fluke, which had temperatures coming in and pressures and flows coming in from a chemical catalytic reaction. So you had real measurements, and then you did a calculation for these alarm limits, and then you modified them. That claim was much closer tied to actual measurements, whereas here we have systems, and the data could come from any system. If you read the spec, it's very broad about the sensors and the systems. It doesn't necessarily have to be in real time. You could collect all this data and run their algorithm or program idea back in the office if you wanted to calculate the well states in hindsight. On the issue of is there something more, I think the important thing is looking at the claims there really isn't. We have a conventional computer processor in the spec. That's what they say can do it, and if you can do this on a general purpose processor, it's really not a limitation. I think the case law is pretty clear on that. I think there's the ordered combination analysis that Alice does, which show here there's nothing unconventional happening when you move the program, the algorithm or the abstract idea. There's really nothing more there than sensors in an ordinary computer. And the machinery transformation test, below they argue that it was tied to a system. That was the thrust of their argument. In their brief, they argued that it transformed the data, and in their reply brief, they argued that the machine side of it. I don't think they meet it on either test because I don't think reading data and using a lookup table with preexisting data is transforming data. I don't think that's what the transformation test is meant to cover. It's more of a chemical, use the rubber example. That's a good example of something changing and being transformed. And I don't think it's tied to an apparatus because the sensors are not in the claims. The data is in the claims. And, of course, narrowing the claims to a particular field doesn't get you there. That's very well established in the 1970s cases. And the preemption that they've raised is not an issue. Ariosa, I think, finally said the absence of complete preemption does not demonstrate patent eligibility. So it's a factor, it's a touchstone, but it doesn't seem to be controlling at all. And I think the claims we talked about, the last series of claims, which are sort of vague, go out and control or do something, are really what I think they call insignificant post-solution activity back in the 1970s. It's just inconsequential. It's not really something more you're looking for in a case like this. I think I've covered most of the points I wanted to make in light of the fact that unless the court has questions on the abstract idea side of the test, I'm happy to entertain questions on that. Currently not. Thank you, Mr. Mims. Mr. Whitaker has three minutes of rebuttal time. Thank you, Your Honor. This really is a case of first impression in the post-Dallas world because none of the cases have involved a specific technical improvement to an existing technological process. If we look at what happens in the claims of this patent, we are taking data that's recited, specific types of data, mechanical and hydraulic, and there's nothing in the record to suggest that that is conventional or well-known. There's nothing in the record that suggests that you could draw up the flow chart. You told me it was. Sir? You told me those 16 data points were well-known. Ah, but accurately getting to them is not. If I said that, then I won't say I misspoke. The idea that there are 16 well states is none. The idea of getting to them, as we can see in figure 5A and 5B at pages A38 and A39, that is invented. That is what is the algorithm. So the patent covers the sensors? It does. There are no sensors. No, the patent chooses which sensors. We're using mechanical and hydraulic sensors. We're not using acoustic sensors. Those are existing sensors. They are, but we're harnessing them in a way that they haven't been used before, and we're validating. There's nothing in the record that says validate it by testing against a limit. We talked in the brief about the patent itself cites 17 different ways of validating data, and we say we claim this way, and the equivalents, of course, but we claim this way, and this gets us to a result. Tom the Driller, the fictitious Driller, he got up there, and he supposedly looked. This is Mobilizer's fictitious Tom Driller, and he said, I can tell you what the well state is, but he was only right 25 percent of the time. This is a problem, and the way that these claims get to that solution by storing the well states, by taking particular types of data from particular systems, they then validate the data in a particular way, and then they put one well state. If you look at A817, the Hutchinson reference, it teaches, well, I'll tell you what. It's either going to be washing or tripping, or it's going to be washing or circulating, or tripping or reaming. It doesn't tell you one well state, one well state, and the claims call out one well state. Many of the prior art systems, and I know I'm straying into the 102 and 103 area here, but they weren't able to select one well state. So what we've got is a specific technological solution to a specific technological problem that is far closer to Diamond v. Deere than it is to Fluke. I've got 15 seconds to talk about Fluke, or is that counting me over? I'm not sure. That's a red light. I'm sorry, sir. We'll give you one sentence on Fluke. All right. Fluke particularly said that in the preamble it was a catalytic chemical process, and then it recited a formula. There was no structure. No, there was a period at the end of the formula. I'm sorry, sir? You stopped. You were given one sentence. I tried not to put a period in. Well, we drilled down hard on this case, and we will consider it submitted. Thank you very much. Thank you, Your Honor. Thank you, Your Honor. All rise. The Honorable Court has adjourned until tomorrow morning at 10 a.m.